Case No. 15-5154, Yassin Mehedi Aref et al., Appellants v. Loretta E. Lynch, Attorney General for the United States et al., Ms. Maripoul for the Appellants, Mr. Grechky for the Appellees. If it please the Court, Rachel Maripoul from the Center for Constitutional Rights for Plaintiffs' Appellants. I am joined by my colleague Alexia Gutha-Cleas. My clients are low and medium security prisoners with clean disciplinary records who were singled out among hundreds of thousands of federal prisoners for segregation in a communication management unit where every form of communication with the outside world is restricted, recorded, and analyzed by counterterrorism unit officials. Now the District Court found that CMU segregation does not present an atypical and significant hardship understanding, and thus granted summary judgment for defendants. I'd like to begin with that issue, please. Before you get to the merits, do you want to address the mootness? Sure, Your Honor. So this case is not moot for three reasons. First of all, the complaint of procedures continue to affect plaintiffs in this case, and that is because the flawed information generated through the BOP CMU designation procedures continues to be relied on by the Bureau of Prisons. We explicitly requested expungement of that information, yet it remains in clients' files. And we know from the experiences of Mr. Giussi, who was subjected to unusual restrictions after release from the CMU, and from the experiences of Mr. McGowan, who, when redesignated to a CMU, the information formerly generated formed the baseline for the court to consider whether he should be put back in a CMU. We know from those two examples that the Bureau of Prisons continues to rely on this flawed information. Second, there is a more than speculative chance that my clients will be redesignated back to a CMU. The Bureau of Prisons concedes that they are still eligible for CMU placement. Other prisoners have been redesignated to a CMU after being released from that unit, including one of the plaintiffs in this case, of course, Mr. McGowan. Finally, even- It doesn't appear to happen very often. Well, that's true. We have evidence of it happening four times, Your Honor. It's not clear if that includes Mr. McGowan or not. We can't tell from the documents. But it is clear that that is more than speculative four times. This isn't the kind of case that the court is generally faced with, where a prisoner challenges conditions in a prison unit, is removed from that prison, and it's possible that he or she could be sent back there. But there's no reason to think it might occur. It's just as likely as being transferred to any other prison. But the CMU is a specific program. Only 200- less than 200 prisoners have ever been sent there. So the prisoners who have gone through there are necessarily sort of under the scrutiny of the counterterrorism unit already. The counterterrorism unit made this explicit when Mr. Giussi was released from the CMU, when they said, you know, we need to keep monitoring him, we need to keep watching him. But even if the case would otherwise be moot, Your Honor, the district court was correct to apply the voluntary cessation exception to mootness here. And under that exception, it is defendants' very heavy burden to show that it is absolutely clear that the alleged illegal conduct will not reoccur. And they've done nothing to meet that burden here. All they argue is that voluntary cessation shouldn't apply. But given that there was three years when there was not a single transfer from the CMU, and the very first transfer occurred on the eve of this lawsuit being filed, of a plaintiff in this lawsuit, we would say voluntary cessation applies. Turning to the procedural due process issue, Hatch v. District of Columbia instructs this court to consider what are the restrictions that prison officials routinely impose for non-punitive purposes on similar prisoners. And under Hatch, that inquiry must start with the way the Federal Bureau of Prisons uses administrative segregation at Terre Haute and Marion, which are the prison facilities where the CMUs are located. Now, this is the first case where a party has ever presented statistical evidence about how administrative segregation actually works, what a typical stay in administrative segregation is. We've provided that information, and it is quite clear that administrative segregation is harsh, but it is short-lived. It lasts one to four weeks, typically. That's at Marion and Terre Haute, and it's consistent across the entire Federal Bureau of Prisons. So we have to compare one to four weeks in administrative segregation to three to five years in a CMU. Now, the district court acknowledged that the prolonged nature of CMU placement is argued in plaintiff's favor. Can I just get one clarification, which is that so you're focusing on duration, which I completely understand, because that's a meaningful and, under your approach, difference between administrative segregation and the CMU. But if you don't look at duration and you're only talking about the conditions, I take it you're not taking issue with the proposition that, with respect to the conditions, there's not a meaningful difference. Well, Your Honor, we would concede that conditions in administrative segregation are harsher than conditions in CMU. But it's not just duration. It is duration, which is important when considering some of these communications restrictions. Lack of contact visits, for example, for five years is quite significant. But it is also typicality, right? And this is what Hatch emphasized, that we have to look at what prison administrators routinely do for institution security. Administrative segregation is incredibly routine. It can be used for a wide variety of reasons. And it is used for a wide variety of reasons. It's the type of thing prisoners can expect to experience at least once. The CMU is incredibly rare. There are thousands of prisoners in the Federal Bureau of Prisons eligible for CMU placement. Only about 200 have ever even been considered for CMU placement. And less than 200 have been placed there. Once prisoners are placed in this unit, they find themselves in a situation where they're in a small unit, segregated from the general population, with primarily a Muslim population. 60% Muslim, compared to 6% in the prison population overall. This experience of segregation in a minority religion unit is a very atypical experience. This is not something a prisoner could expect to experience in the normal course of being incarcerated. And that is particularly so where there has been no misconduct, right? So CMU designation doesn't turn on the question of whether there's been a rule violation. Prison discipline is routine in the prison system. So the cases the district court relies on and that defendants rely on, where admittedly severe restrictions are placed on communication after disciplinary process, are really irrelevant to this situation. Because prisoners understand that they may be subjected to discipline if they violate a prison rule. That is accepted. It is routine, just as administrative segregation is routine. Being singled out for this treatment without misconduct is not routine. I'd like to turn for a moment to the retaliation claim, unless the court has questions about procedural due process. So Mr. Giussi was placed, Mr. Giussi in 2008 gave a sermon when he served as rotational Juma prayer leader. And three years later, after his unit team had recommended him for release from a CMU and the warden had concurred, the counterterrorism unit recommended against his transfer from the CMU based on that sermon that had occurred three years earlier. The regional director concurred and Mr. Giussi was kept in a CMU. Now the district court deferred to Mr. Smith's identification of Giussi's sermon as presenting a security risk. The court held that it would not look beyond Smith's identification of that risk because Turner requires deference. But Turner does not require blind deference to a prison administrator's identification of a risk where there is evidence that that assessment has been exaggerated. We provided that evidence, which the district court declined to review or describe. And really that evidence starts with the text of Mr. Giussi's sermon, which you can find at page 834 of the joint appendix. So the sermon is laid out in full there, your honors. And one must compare that sermon with Mr. Smith's description of it in his memo recommending that Mr. Giussi be retained in a CMU. You can find that memo at page 791 of the joint appendix. So Mr. Giussi's sermon to his fellow Muslims in the unit when he was rotational prayer leader talked about the fact that they felt as though they were in this unit because they were Muslim. It asked his brothers in the unit to have patience and to stand firm to their faith. He described Nelson Mandela and John McCain as examples of people who were incarcerated, who were tortured, and yet had patience and faith that someday they would be released. This sermon, and compared to those words about patience and faith and endurance, Mr. Smith described the sermon as inciting violence and denigrating other religions. This is simply a disconnect. The sermon does nothing like that. Where there is evidence of an exaggeration, Turner does not require deference. So for example, if the court considered Hatim v. Obama, a recent case from this circuit, this court looked at the prison in Guantanamo's analysis that they required more strict search procedures prior to attorney-client visits for Guantanamo detainees based on the concern that detainees had been found with contraband. And this court said, well, that's a reasonable security concern, and requiring additional search protocols is a reasonable response. We look no further. But what if there had been evidence of exaggeration in that case? What if Guantanamo prison had justified the searches stating that there had been 20 instances of contraband being found at the prison? And then plaintiffs were able to produce evidence to the court that, in fact, there had not been a single instance of detainees possessing contraband at the prison. At that point, there is evidence of an exaggerated concern. And this court can look beyond a prison official's assessment of concern where there is that evidence of exaggeration. And what exactly are you pointing to for your evidence of exaggeration? Well, the strongest piece of evidence, Your Honor, is the sermon itself and the way in which Mr. Smith described it falsely. But we can also look at the possibility of other alternatives here, which Turner instructs us to do. The most obvious alternative, if Mr. Giussi's speech presents a security concern, is to say, stop giving political sermons to your fellow prisoners. Defendants themselves point out in their brief that Mr. Giussi was never kept from giving other speeches in the CMU. So we have a situation where there's an identified security concern of sort of concerning rhetoric. And yet the prison's response is, keep this person in the unit. Don't tell him he can't engage in this kind of speech. Don't tell him he's being kept in the CMU because he's engaged in this kind of speech. And yet, three years later, use this speech as a reason to keep him in the CMU. But they are not keeping him in the CMU to isolate him from these other prisoners, but because the CMU allows them to do a kind of intensive monitoring of his communications. Well, that's true, Your Honor. But under the retaliation test, what we would need to prove is that there was First Amendment-protected speech. And then a retaliatory action taken of sufficient seriousness to deter an individual from usual firmness. And that the speech was the but-for cause of that retaliation. So really what the court has to analyze there is whether being retained in the CMU, where you're not in isolation but you are in segregation with much harsher restrictions on communication than you would otherwise experience in general population, is whether that is sufficiently serious. And defendants have not argued that it is not. I want to go back to what you were saying about exaggeration because I think this is sort of a difficult question for the court. You're looking at what he says and you say, well, he exaggerated the seriousness of that. But isn't there a difference between a dispute about facts? I mean, you read this differently. And a dispute about professional judgment. In other words, the head of the CTU was saying in looking at this sermon, he came to the conclusion that he should be concerned about what was being said. So it seems to me, you know, what standard do we apply? It can't just be that you read it differently. Well, I think that's correct, Your Honor. And I think the standard under Turner is deference to a reasonable identification of a security concern and a reasonable response in the absence of evidence, substantial evidence on the record of exaggeration. So if we look at sort of how the Third Circuit and the Sixth Circuit dealt with this question in Abu Jamal and Flagner, those are situations, too, where prison administrators identified in their professional judgment particular security concerns. But because there was substantial record, substantial evidence on the record before the court, the court looked behind that identification to consider the evidence of exaggeration and to make its own determination of whether the challenged action was reasonable given the threat posed. So here's what we said in Hatim. The only question for us is whether the new policies are rationally related to security. We have no trouble concluding that they are in no small part because that is the government's view of the matter. That just seems like a level of deference about the government's estimation of whether there's a security risk that's in some tension with the notion that we would look behind the government's reading of the comments to determine whether they present a security risk. Well, I think that's right, Your Honor, and that's because the court starts under Turner in a situation where unless there is actual evidence of exaggeration, that kind of deference is appropriate. The court won't judge for itself whether this was the best response to take or whether this is really such an important concern unless there is evidence of exaggeration. So in Hatim, the plaintiffs in that case argued that the searches weren't really necessary because it hadn't been shown that attorneys were passing contraband to the detainees, all these sort of theoretical reasons why perhaps this was not really so reasonable in this situation. They didn't present actual evidence, factual evidence of either an exaggerated threat or an exaggerated response. Now, Turner directs us to sort of two different ways in which plaintiffs could produce that evidence. Turner requires the penological purpose to be legitimate and valid. It says that in the test itself, and if you can't look beyond a prison administrator's identification of a valid threat, then that has no meaning at all. Then there is no protection beyond what administrators identify. Prison administrators can always say that there is a legitimate threat. There has to be a way for the court to look beyond that. And, of course, second is the Turner test's reliance on the possibility of easy alternatives. If there is an easy alternative, this suggests what happens here wasn't reasonable. I see that I am out of time. I did want to say a word about the Prison Litigation Reform Act. May I say one brief word about that? Yes. Thank you. Thank you, Your Honor. So under the PLRA, prisoners are banned from bringing claims for mental and emotional injuries without a prior showing of physical injury. Defendants and the district court have interpreted that to bar all claims unless there is a showing of physical injury. Now, this renders the language mental and emotional injury in the PLRA superfluous, and it also flies in direct contrast to this court's decisions in Hobson and in Dovey District Court, clearly stating that there are injuries distinct from mental and emotional injury and physical injury, which are compensable and real injuries. First Amendment harms can be actual injuries. They may be intangible, but they are actual injuries that plaintiffs should have the opportunity to prove. Denial of release preparation programming here is an actual injury. My clients were kept from engaging in that programming, which has a market value outside of prison and has a value inside of prison. They were kept from family relationships. They experienced harm to reputation. All of these are injuries this court has recognized as distinct from mental and emotional or physical. The Prison Litigation Reform Act does nothing to change the reality that there are not only two forms of injuries, which are compensable by the courts. And, of course, if at the end of the day we are unable to place a dollar value on those injuries because they are so intangible, then at that point nominal damages becomes appropriate. Thank you. Other questions? Thank you. May it please the Court, Carly Zubricki for the official capacity defendants and for the United States as amicus curiae. I want to start by talking about the mootness arguments. Plaintiffs in this case brought this action to procure further procedures or procure their release from the communications management units. They have now, at this point, been out of those units for a matter of years. Mr. Giussi was released in 2013. Mr. Aref was released in 2011. Those, and there is no continuing ongoing injury as a result of those placements. CMU placement is not something that's punitive. Plaintiffs cited cases, for instance, discussing disciplinary records that might follow an inmate sort of after, you know, if they've been disciplined in a way that turned out to violate the law. You know, we've heard evidence that CMU placement is not something that operates like that. If we assume that the voluntary cessation doctrine applies, do you have an argument that you can satisfy your burden? Yes. And have you made one? The thrust of your argument was that voluntary cessation just doesn't apply here. Yes, I think that is the thrust of our argument. But if we disagree, just assume, I'm not saying we necessarily would, but just for purposes of argument, if we assume that voluntary cessation does apply, then that puts a heavy burden on the government to show that there's only a speculative possibility of going back to the CMU. It does. And as you noted, Your Honor, we did put forward, there is evidence that only four of, you know, well over 100 inmates who as of 2013 had been released from the CMU had ever been returned to the CMU. And we think that that's, you know, a very small percentage and really a speculative possibility of being returned. There's also evidence in the record by the relevant decision makers at the time, establishing that the inmates would not have been returned to the CMU absent the development of new information that would have required them to be replaced in the CMU. So there's a declaration from the regional director, who was the ultimate decision maker at that time, and also from Mr. Smith. So we do think it's speculative. And moreover, even if they were sort of at some point reconsidered for CMU designation, we at this point, there's, you know, more formalized procedures as a result of the 2015 regulations, which renders the possibility that the sort of, you know, many of the due process allegations, for instance, that they've discussed here involve, you know, problems early in the development of CMUs where there was a little bit less clarity about exactly how some of the processes would work. And there's no reason to think that that kind of a problem would occur, even in the sort of hypothetical chain of events where there has been new information that resulted. That's not a mootness argument, I take it. Well, I think it goes to the question of the likelihood of the harm being repeated for purposes of sort of whether it's speculative to think that they would be injured in this way again. I think that's how I would think about that. But also, you know, we don't think that this is an appropriate case for the application of the voluntary cessation doctrine. The procedures by which the inmates were released or transferred out of the CMU, you know, began in 2009. You know, many, many inmates have been released pursuant to those procedures, and it really, you know, the BOP absolutely would not have transferred Mr. Jainski, for instance, in 2013, three years into this litigation as a result of this litigation. That was the result of processes that I think are clearly demonstrated throughout the record that concluded that he no longer, his communications no longer warranted the sort of monitoring that a CMU could provide. So what is your response to counsel's argument that this information, which they say is flawed information, which was the basis of them being placed in the CMU in the first place, could still be used and still might be a basis for them being returned? I think our response is that that doesn't present a concrete ongoing injury. That's not something that, first of all, you know, there's not evidence that that would create any kind of actual concrete effect on the plaintiffs at any point or that it's, you know, likely to or going to. You know, again, this is not something that's like a disciplinary event where you've got a record. The fact that the inmates were in the CMU has no effect on their current placements. They're, I believe, currently low-security inmates housed in Pennsylvania. And so we don't think that that's an ongoing injury that would give rise to continuing jurisdiction over this matter. Turning to the due process claims, I want to emphasize that inmates in BOP systems or in BOP placements do not have a right to privacy in their communications. They do not have a right to not be monitored. There is, you know, extensive monitoring in all sorts of situations of communications in every BOP prison, and indeed many of them are required by regulations. And the kinds of monitoring that occurs in a CMU is really quite similar in many respects to the kinds of monitoring that a BOP can use all of the time in all of its facilities. But there must be something distinctive about a CMU. That's why you have it. Well, I think the most important reason for the CMU is that the CMU makes it significantly more difficult to circumvent communications monitoring. Right? So when you're in sort of a general prison population, there are ultimately limits on the extent to which the BOP can effectively monitor all communications, although it certainly does sort of attempt to target based on perceived risk levels and security threats and that sort of thing. But there are, as I think was explained in the regulations that were passed in 2015, the primary purpose of the CMUs is to prevent there being a way to sort of get around those controls. But the monitoring is something that can happen even in a sort of more general facility in terms of the expectations of privacy that in those facilities would have. Your argument is that it's a difference in degree, correct? It's a difference in degree, yes. It's more intensive. But is it a small difference when you're saying that because you're subjected to this monitoring, it changes visitation, it changes how often you can talk to your family, it changes several things that if you were in the general population, you would have more freedom to do? Again, even in the general population, we think it is a relatively small difference of degree, yes. Even in the general population, you know, wardens would have the discretion to limit particular inmates' levels of communications and, you know, the nature of visitation and that sort of thing in all sorts of instances. You know, there are numerous cases that have addressed, for instance, bans on contact visitation, which we understand is probably one of the more restrictive elements of being in a CMU. But taking into account that sort of the overall baseline that we're talking about is the baseline of conditions in sort of ordinary prison life, which in really every meaningful respect except for these carefully tailored limitations designed to prevent circumvention of communications monitoring for inmates who are deemed to be at particularly high risk with respect to that particular area. You know, other than that, you know, the conditions in CMU are essentially identical to the conditions in any other. So with the contact visits, for example, which you're understanding can be a significant issue. Four-pointed say, I would suggest it is. Yeah. It's the duration is quite a bit different from what you would have in other situations in which contact visits might be curtailed for a brief period. Well, I mean, there are certainly cases, for instance, the Sixth Circuit case in Bezzetta and I think there's the Ninth Circuit case in Macedon. You know, there are a number of, and the Third Circuit case in Henry, there are a number of courts that have addressed, you know, years-long or even potentially permanent bans on contact visits and have concluded that those did not give rise to the kind of, you know, it's a particular type of visitation. So it's a restriction on a particular type of a particular kind of communication. The BOP allows for, you know, visitation and other kinds of communications and essentially unlimited correspondence within the CMUs. And, again, sort of against this baseline that includes sort of both the ordinary conditions of confinement and, you know, the most restrictive conditions that the BOP or a prison can impose over the course of, you know, over the course of a particular kind of sentence. We don't think that that's a sufficient enough change to give rise to additional constitutional protections here. You know, this is really like, it's really analogous to, for instance, the decision to place somebody in a medium security facility as opposed to a low security facility. It's an administrative security-related determination. It may impose some greater burdens on the inmates, but it's those additional kinds of burdens or those additional changes in confinement are not a sufficiently substantial difference from the conditions of confinement that are part of the overall sentence. I thought the baseline for comparison was administrative segregation. Well, yes, the administrative. But you've not been arguing with that one. It's not a comparison to the general population. It's a comparison to administrative segregation on the hatch. At least that's my understanding. That's correct, Your Honor. And the reason that I'm arguing, you know, not only is this an extraordinarily far cry from the conditions of administrative detention, which are, you know, in every meaningful respect, except for sort of with respect to communications, dramatically more restrictive. Except for duration. That's correct, although I will note that administrative segregation can also go on for a very significant period of time. It can, but it looked like the averages that are in the record, there's a pretty stark difference between what we normally expect for administrative segregation and what we normally expect for CMU placement. Sure, yes, there's certainly a significant difference. But, again, I think that the extent to which this is a completely different sort of order of magnitude of kind of restriction than what we're talking about in the context of administrative segregation, where, again, you know, there's evidence in the record that administrative segregation, you know, is a single cell for 23 hours a day or 5 hours of exercise a week. You know, when you're in a CMU, there's sort of all of the normal sort of aspects of confinement. You're out of your cells with other inmates for 16 hours a day. You know, you have telephone calls. You have visitation. You know, even with respect to communications, there are still ample opportunities to communicate with the outside world. And so we just really don't think that this is the kind of fundamental change in the conditions of confinement that under certainly under the standard of Hatch, but really even against a lower baseline than the standard that this group must apply from Hatch to, you know, give rise to a protected liberty interest. I think what is puzzling here is how we actually apply the precedents that we usually look at. And I think your responses have sort of highlighted that because normally we're looking at is it atypical? You know, is it different from what the prison officials normally do? And the problem here is the whole unit, the CMU, is atypical. You know, it doesn't look like the other things that we have used as a baseline in the past. In other words, it really doesn't look like administrative segregation. When you look at duration, it looks different. And it's a much smaller group. It's not done for discipline. So it's in just about every way completely atypical. But that's what we're trying to gauge. I don't think the atypicality question is a question sort of about whether one particular set of restrictions, how frequently that's applied. I think the question is sort of how it fits into the range of conditions that sort of are a part of a term of confinement as a result of a conviction. And so I don't think the fact that the BOP has made efforts to, you know, in a reasonably targeted way. You know, there are other measures that BOP takes that are relatively rare. For instance, there are special administrative measures that are, you know, far more individualized restrictive restrictions on certain inmates. You know, that's something that's very rare. And, for instance, there might be need to separate or take certain aspects with respect to inmates with particular, you know, gang affiliations. Or, you know, there might be, you know, relatively infrequent kinds of determinations that the BOP needs to make. But I don't think that within the meaning of, you know, the question of how the actual conditions imposed by that restriction relate to the overall expected conditions of confinement. I don't think that the rareness is, you know, if anything, I think it suggests that the BOP is making individualized careful determinations here. But it's really a, again, it's really an administrative security-related housing determination that the particular forms of security risks that the BOP is concerned with with these inmates relate to communications. And for that reason, they are sort of, you know, have in many ways, you know, significant freedom of flexibility throughout the day given their incarceration with tailored limitations on their communications. With respect to Mr. Giussi's First Amendment retaliation claims, I want to – I see that I am over time. With respect to Mr. Giussi's First Amendment retaliation claims, I just want to emphasize that Mr. Giussi was housed in a CMU as a result of the facts underlying his crime of conviction, which involved coded communications, participating in a covert cell to funnel resources and recruits overseas to commit acts of terrorism. That's what he was convicted of, and that was sort of the backdrop against which every future determination about whether his housing placement was still warranted was made. And we think that a review of the determinations in this case and the BOP's considerations to continue his housing plainly further legitimate penological interests and were, you know, within the bounds of reasonableness required by the Turner test. So how much do we defer? Because if you look at speech that gives rise to a consequence and if we assume that the speech is completely innocuous, and just for assumption purposes, and then the BOP or the government or the CTU, whoever's making the determination, says, you know, I see in that, if you tease out of it, I can see some things that actually raise a security risk, and therefore we're going to exact a consequence for the speech. Is the court just supposed to defer to that period? Or do we look behind it a little bit to find out whether there's some reason supporting the conclusion that there's a security risk from what seemingly fairly innocuous speech? I think the Turner test is essentially designed to answer this question. I think that the court has to assess whether there's a, you know, rational, logical foundation for the official action. You know, it might be possible that there would be cases where that rational relationship didn't exist. We think it plainly does in this case when you consider especially the backdrop against which Mr. Taizzi's statements were considered relevant to this analysis to the extent they were. But I think that the Turner test is designed precisely to answer this question. So does Turner, though, presuppose deference purely because the government reached the determination that there's a security risk? Or does it allow for judicial scrutiny of the rationale by which the government reached that conclusion? You see what I'm saying? Because there's a little bit of a difference. You could say, well, the government concluded that there's a security risk. Turner says that once the government reaches that conclusion, we defer to that. That's one thing. But another way to do it is the government reached the conclusion that there's a security risk. We as a court look at the logic by which the government made that determination and ask whether that's a sustainable determination. Well, I think the question the court asks under the Turner test is very deferential. I think it is a question that the court asks, and it's under the first step of the Turner test, and it's whether there was a valid rational connection. I think Beard v. Banks also suggests that the relevant question is whether the ultimate determination was outside the bounds of reasonable professional judgment. There can't just be sort of a question of fact as to whether the decision was right or wrong. I think the overarching inquiry is whether it was outside the bounds of reasonable professional judgment. In this case, this is not a case where one official reached a conclusion. If you look at the e-mail exchanges that are in the record in the immediate aftermath of Mr. Jussi's speech, numerous BOP officials immediately viewed this as an indication that Mr. Jussi's placement was appropriate. They viewed this as a problematic incident. This is not a case where there was sort of an official determination kind of unrelated to any sort of or there's one kind of rogue official here. There's no evidence in the record that it would be outside the bounds of professional judgment to believe that Mr. Jussi's speech continued to warrant monitoring against the backdrop of this crime of conviction, again, which involved a sophisticated communications-related, terrorism-related offense. Isn't the significance of the case law that we don't do this the way we would normally do with respect to summary judgment because the burden is heavily on the plaintiffs to contest the exercise of professional judgment? That's what's different. You can't, as Judge Brown said a number of minutes ago, you can't simply come in and say, but we can. This is a disputed fact here in professional judgment. We give a strong presumption in favor of the government, and I think the case law says the burden of persuasion is on the plaintiffs, and it's a very heavy burden to me because of the deference that's given. That's correct. Well, but you see, what Judge Winvason, I thought, was asking you is, and you seem to be buying into it, no, the court has a role to just kind of now assess it, and we second-guess the judgment. It seems to me, I thought the case law was saying, all I've got to do is show they're in the category of professional judgment. That's it, and the government sits back, and the plaintiff has got to. That's my view of the case law? I'm just curious to hear what you're saying because you're answering it very differently. I thought the case law said professional judgment has been established, the burden is on the plaintiffs, they either make it or not, and it's a very, very heavy burden to me because the deference is so high. I think that your understanding of the case law is correct. The only thing I would add to that is that I think under the first factor of the Turner test, I think that there's sort of this logical, there has to be sort of a logical nexus, and I think that the court can look and say, okay, that's patently, that's a ridiculous position that the government has taken here, and I don't think we're in that world. That's what gets us in the category of professional judgment, yes. Yes, I think that's right. And just quickly turning to the Bivens claims, if I may, I just also want to emphasize, you know, we've presented arguments on the PLRA, and we think that the PLRA has been correctly construed by the circuit to require a broad restriction on damages, but I also want to really emphasize that, you know, even, you know, beyond as we've argued the fact that we don't think that these claims survive at this stage for numerous reasons, I also want to emphasize that under a straightforward qualified immunity analysis, we think that even if the claims did survive and went forward at this stage, you know, there is no reason that, you know, the decision is just. So the district court didn't look at qualified immunity, right? Sorry? The district court did not consider qualified immunity, but it was on third of the motion to dismiss, and it was fully briefed below, and we think it would be, you know, well within, you know, this court could certainly affirm the judgment of the district court on the basis of. We just have to do something the district court didn't look at already, which you're right. It's within our discretion to do that. No, no, that's correct. So on the individual capacity claims, so what about nominal damages? If that, at least in terms of a straightforward ground for non-affirmance, if nominal damages, the only question on nominal damages as far as I could tell is whether it's sufficient, it's requested with sufficient specificity. I think you would agree that if it's requested with sufficient specificity, then nominal damages is enough. Correct. Right. And so there is a general prayer for relief, and we know from the briefing that nominal damages is something that the plaintiffs are requesting. Again, you know, that's all correct. You know, the prayer for relief requested expressly compensatory damages and punitive damages. It did not request nominal damages, and we also think that in light of. But it wasn't limited to compensatory. It wasn't limited to compensatory and punitive. No, there was also a general prayer for relief. You know, we also, you know, the approach the Davis court took seemed to look pretty carefully at what exactly the plaintiff had asked for, and I also think there's good reason to require a plaintiff to plead nominal damages in a PLRA case, just given that the overall purpose of that PLRA limitation is to sort of prevent frivolous lawsuits and prevent sort of ongoing or, you know, prevent the sort of wide barrage of prisoner litigation and, you know, requiring prisoners to actually expressly allege the kind of damages that they're seeking and, you know, be aware that, you know, the only relief they're going to get is nominal damages. We think that does, you know, serve some purpose. But even if. But it's not the frivolousness of the claim. It's just a method of relief and nominal damages. I mean, sure, you could tick off nominal damages in a complaint, but that doesn't seem to be accomplishing a great deal vis-a-vis the PLRA. Sure. I mean, I think that the thing that it would accomplish would be to sort of limit the overall tide of prisoner litigation because prisoners would have to sort of know that they were only going to be able to get nominal damages. But even setting all that aside, you know, rather than. Well, I don't think they'd ever say they're only going to get nominal damages. I think what they would say is we're asking for nominal damages and then anything else. Sure, sure. I think that's right. But in any event, you know, I think that even if this court thinks that nominal damages should be available here, in this case we think that turning to the qualified immunity analysis would be appropriate. Then you go to qualified immunity if nominal damages. Exactly. And, you know, we think that the communications-related monitoring questions that Mr. Smith was faced with here are, you know, a far cry from anything addressed in any of the case law, and it would not have been beyond debate how he was entitled to consider speech in making the difficult determinations he was faced with. If there are no further questions. Nothing further. Thank you. Ms. Maripol, I think we used up all of your time, but we'll give you two minutes for rebuttal. Thank you, Judge. I'll just make three quick points. First of all, with respect to opposing counsel's point that the 2005 rule changes some of the procedures at issue in this case, the 2005 rule does not change anything that is at the heart of Plaintiff's procedural due process challenge. Under the new rule, there is still no requirement that the decision-maker write down the reasons for his or her decision about why an individual is sent to the CMU. There's no requirement that the prisoner actually receive notice of the actual reason he was sent to the CMU, as opposed to one of the reasons why he was recommended for the CMU. The new rule does not change the fact that the administrative remedy process remains the only way a prisoner can review their CMU placement, and the new rule does not change the fact that when a prisoner is reviewed for potential release from the CMU, they are not provided information about why redesignation out of the CMU has been denied. None of those procedural deficiencies, core procedural deficiencies, have been addressed. Second, opposing counsel made the point that being put in a CMU is really like being put in a medium-security prison as opposed to a low-security prison, and I just want to make clear that classification is a routine prison security measure that applies across the board. Now, we cannot take the government's invitation to read atypicality out of Sandin's significant and atypicality standard. Atypicality is in there for a reason, and it's because when a small subset of individuals are singled out to be treated differently, especially so in a situation like this one where they primarily come from one religious group, due process is more important. It's not that the government may not be able at the end of the day to put communications restrictions on these individuals. It's that they must make some minimum procedural protections to ensure that individuals aren't being detained arbitrarily or discriminatorily. And finally, with respect to the Turner question, I think, Judge Edwards, your point that once we're in the realm of professional judgment, the plaintiffs bear a heavy burden, that that is correct, but we have met that burden here. This is one of the rare cases where we have met that burden, and that is because not only does the court have the actual text of the sermon to look at and a description of that text that is just not a reasonable description. It's outside reasonable professional judgment. Mr. Smith's entire memo is replete with misstatements. He says that the unit team at Terre Haute declined to recommend Mr. J. You see from release for release from the CMU because of his radicalization, and that's just not the case. It's shown in the record. That was not the reason they recommended against his release. He says that Mr. J. You see, was banned from serving as rotational prayer leader. That's not the case. He says that Mr. J. You see, recruited, recruited Jose Padilla. That is not the case. This is not an exercise of professional judgment. This is simply an inattention to the actual facts. Thank you, Your Honors. Thank you. The case will be submitted.
judges: Brown, Srinivasan, Edwards